WALL-WOLFF LLC

299 BROADWAY, SUITE 800
NEW YORK, N.Y. 10007
_____

TEL. (212) 920-0257
mwallwolff@wallwolff.com

_____

May 21, 2024

**By ECF**

Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Terris Oliver*, 22 Cr. 378 (AKH)

Dear Judge Hellerstein:

I write on behalf of Terris Oliver, who is scheduled to be sentenced on June 4, 2024. For the reasons set forth below, I respectfully submit that a downward variance is warranted in this case.

## I.     Preliminary Statement

Terris Oliver is a father and grandfather who has spent nearly two decades building a stable life for his children and family far away from the impoverished and violent neighborhood where he grew up. The events of his childhood and adolescence left him in a constant state of fear and hypervigilance, and as a teenager he succumbed to the insidious influences of his neighborhood. When he was 20 years old he made the worst decision of his life. He has regretted it ever since, and by his mid-20s he left that life behind and moved to Massachusetts to raise his children and give them a better future. He eventually found stable employment and has been consistently working since then.

The outpouring of support on Mr. Oliver's behalf is a testament to the person he has become. A beloved father, stepfather, and partner, he is an entirely different person than the troubled young man he was at 20. This is not an excuse for his actions, but it is our hope that this submission will help provide context for determining the appropriate sentence in this case. We urge the Court to consider Mr. Oliver's young age at the time of the offense, the long period of time since it occurred – over 20 years ago – and his considerable and independent rehabilitation

Hon. Alvin K. Hellerstein
Page 2

in the intervening years. For all of those reasons, and for the additional reasons explained below, a downward variance is sufficient, but not greater than necessary, to accomplish the goals of sentencing in this case.

## II.    Factual Background

### A.  Personal history

Mr. Oliver was born on January 11, 1982 in the Bronx.[1] As detailed in the mitigation report, his childhood was difficult and marked by poverty, trauma, and abuse.[2] He often did not have enough to eat, and his mother struggled to make ends meet. Mr. Oliver's father was deeply troubled, involved in crime, suffered from a drug addiction, and died of a heroin overdose when Mr. Oliver was just 7 years old. His father's death was not explained to him and Mr. Oliver was left to process his overwhelming grief on his own.

Once a happy and enthusiastic toddler, Mr. Oliver began to struggle under the pervasive deprivation and violence of his home and his neighborhood. His relationship with his mother was difficult, and he both witnessed and was the target of significant violence and abuse as a very young child. He was sent away to a boarding school in upstate New York when he was just 10 years old, and at age 12 he was again sent away to live with a family in North Carolina, where he was subjected to both physical and emotional abuse in the guise of "discipline." When he returned to the Bronx at age 14, he moved in with his paternal grandparents, who were able to provide some stability.

Such a difficult and traumatizing childhood has lasting effects on a person's growth and ability to function in stressful environments, particularly in adolescence and young adulthood. As detailed in the psychological report prepared by Dr. Sanford Drob, the unusually traumatic events of Mr. Oliver's childhood and early adolescence caused him to manifest symptoms of Posttraumatic Stress Disorder. Exhibit B at 12.[3] Mr. Oliver also scored unusually high on the CDC-Kaiser Permanente Adverse Childhood Experiences questionnaire (ACE). *Id*. at 13. Just one in five ACE study participants report a score of 3 or more ACEs – Mr. Oliver scored 7, which is highly elevated. This is not surprising given the events he experienced, which "placed him at an unusually high risk for psychological difficulties and problematic behavior later in life." *Id*.

---

[1] Unless otherwise noted, facts in this section are drawn from the PSR, the mitigation report, and interviews with Mr. Oliver.

[2] The mitigation report of Lisa Orloff, LMSW, ACSW, is attached hereto as Exhibit A.

[3] The psychological evaluation and report prepared by Sanford Drob, Ph.D. is attached hereto as Exhibit B.

Hon. Alvin K. Hellerstein
Page 3

Although he had found some reprieve living with his grandparents, it was not enough. The violence around Mr. Oliver increased when he became a teenager and eventually became inescapable. He suffered the loss of several of his friends to gun violence, and he lived in a constant state of fear and despair. In high school he fell in with the wrong crowd, and although he was bright and had done well in school, he started attending classes less and eventually left school altogether, tragically succumbing to the corrosive influences of his neighborhood.

## B.  Offense conduct

When he was in his late teens, Mr. Oliver became involved in selling drugs with a group of people who lived in and around his apartment building. The older members of the group had established themselves in the drug trade, and Mr. Oliver made the terrible mistake of believing that joining them would somehow better his life. But of course it only brought pain to himself and those around him. On March 27, 2002, Atari Felton and another person armed themselves with guns and began firing at a group of people – including Mr. Oliver – who were standing in front of the building. Mr. Felton and the other person fled the scene, and then came back and fired shots at the group again. A leader of the group insisted on finding Mr. Felton. Several people, including Mr. Oliver, located Mr. Felton exiting a convenience store, still armed with a gun. The group fired several shots, and one of those bullets struck him in the torso, killing him.

## C.  Move to Massachusetts to raise his family far away from the Bronx

Mr. Oliver has been haunted by that night for over two decades. Although it took him a few years, he was eventually able to leave the Bronx for good. When he was 23 years old he was convicted of gun possession after he got into an argument with his uncle.[4] After he was released, and as he moved into his mid-twenties, he reflected on his life and became increasingly distressed at his choices and the violence all around him. He and his girlfriend, Melissa Torres, decided to move to Worcester, Massachusetts, to build a better life for their children, far away from the chaos and influences that surrounded Mr. Oliver when he was growing up. They settled in Massachusetts to raise their family, going on to have three children together. Mr. Oliver also had full custody of his eldest son, and he and Ms. Torres raised the four children together in Worcester for 15 years.

Mr. Oliver was eventually able to find work in Massachusetts, working at various jobs to support his family. He held a number of jobs including as a cashier, a gas station attendant, a cable technician, and eventually finding consistent employment as a trucking and delivery driver, receiving his OSHA certification in 2015. He did everything he could to give his children a

---

[4] While Mr. Oliver had an arrest at age 27 for disorderly conduct, that arrest was sealed and did not result in any conviction.

Hon. Alvin K. Hellerstein
Page 4

different life than the one he had growing up, making sure that they stayed in school, had enough to eat, and lived in a loving and peaceful home. However, things weren't always easy. He and Ms. Torres still struggled to make ends meet and Ms. Torres faced difficulties of her own, and she and Mr. Oliver decided to end their relationship after 15 years. Although they are no longer together, they maintain an amicable co-parenting relationship and he is involved in his children's lives. Ms. Torres has written him a letter of support attesting to his dedication as a father, as have the other mothers of his children.[5]

After his relationship with Ms. Torres ended, Mr. Oliver met his fiancée, Kimberly Mitchell, in 2021. Since that time he has been a dedicated stepfather to Ms. Mitchell's two children, and a constant source of love and support to Ms. Mitchell's father and the rest of her family. In 2023 Mr. Oliver and Ms. Mitchell had a baby of their own, and he has been exceedingly distressed to be separated from him – he sees him whenever visiting is available, and calls multiple times a day to check on Ms. Mitchell and his infant son.

Mr. Oliver is a dedicated father to all of his children and his stepchildren, and has been able to help them build stable lives that he never had. Two are in college and a third will begin college this Fall. As Dr. Drob notes in his report:

> Mr. Oliver is at an age when many individuals who have engaged in antisocial behavior refrain from such conduct and lead law-abiding lives. The transformation and maturity that naturally comes from age has in Mr. Oliver's case been especially noteworthy . . . . He is currently highly committed as a father, stepfather, and partner with his significant other.

Ex. B at 15.

### D.  Arrest, detention at MDC, acceptance of responsibility, and guilty plea

On May 25, 2023, Mr. Oliver was arrested in Massachusetts and was thereafter transferred to the Southern District of New York, where he has been detained at MDC Brooklyn. On December 14, 2023, Mr. Oliver accepted responsibility and pleaded guilty to the Superseding Information.

Despite the harsh conditions of confinement at MDC, Mr. Oliver has done everything he can to make the best use of his time in the months he has been detained there. He has participated in numerous programs and received multiple certificates in Art, Ethics I, Ethics II, Parenting, Resume Writing, K2 Awareness, Chess, and Conflict Management. His ethics courses were

---

[5] Letters submitted on Mr. Oliver's behalf are attached hereto as Exhibit C.

Hon. Alvin K. Hellerstein
Page 5

college-level courses administered by Columbia University, and he was one of only a few students to receive college credit.[6] He has also worked as an orderly, receiving outstanding performance reviews from his supervisor,[7] and has received no disciplinary infractions in his time there.

Mr. Oliver is eager to obtain his GED, and took his GED exam on April 8th and 9th. He achieved passing scores in science, social studies, and reasoning, and missed the math threshold by just 3 points. He will retake the math portion of the examination on June 3, 2024.

### E.  The PSR and Probation recommendation

Probation issued the final draft of its PSR on March 28, 2024. Consistent with the plea agreement, Probation calculated that the total offense level was 40 and the guidelines range is 240 months. Probation emphasized that there were a number of factors that warranted consideration of a sentence outside the guidelines range, including the time period of Mr. Oliver's conduct in the offense, his traumatic upbringing, the physical abuse he endured and witnessed, his constant relocation, his familial responsibilities, and the care of his youngest child. PSR ¶ 97. Probation recommended 200 months imprisonment. *Id*. at 23.

### III.    Argument

As this Court is well-aware, it must consider an array of factors in formulating the appropriate sentence for Mr. Oliver, including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed treatment; (3) the kinds of sentences available; (4) the Guidelines range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (7) the need to provide restitution. A sentence must be "sufficient, but not greater than necessary," to achieve the goals of sentencing. 18 U.S.C. § 3553(a). Here, the 3553(a) factors warrant a downward variance from the guidelines.

### A.  A downward variance is warranted to account for the inclusion of a Youthful Offender adjudication in Mr. Oliver's criminal history

#### 1.  Youthful Offender adjudication

Mr. Oliver has two convictions that count toward his criminal history. One of those

---

[6] Copies of Mr. Oliver's course certificates are attached hereto as Exhibit D. The course completion certificate for Chess is forthcoming, and Mr. Oliver is still taking the Conflict Management course and will receive his certificate upon completion.

[7] A copy of Mr. Oliver's work performance review is attached hereto as Exhibit E.

Hon. Alvin K. Hellerstein
Page 6

convictions was the result of a Youthful Offender adjudication (YO) that occurred when he was 18 years old. For public policy reasons YOs generally remain sealed in the state – yet confoundingly, they are disclosed to Probation and included in federal criminal history computations. While the Second Circuit has held that it is permissible to treat youthful offender adjudications as adult criminal history for the purposes of federal Guidelines calculations, *see United States v. Jones*, 415 F.3d 256, 262-63 (2d Cir. 2005), this contravenes the intention of New York law. YOs were intended to avoid the lifelong consequences of a criminal record so that people do not live their entire lives with the stigma of conduct from their teenage years. The youthful offender procedure "provides an avenue for the court to exercise discretion upon conviction of certain young offenders to: (a) avoid branding a youth with lifelong stigma of a criminal conviction; and (b) eschew imposition of certain mandatory sentences of imprisonment." Peter Preiser, Practice Commentary, Criminal Procedure Law § 720.10 (McKinney's 2011). New York law is clear that a youthful offender adjudication is not a judgment of conviction for a crime or any other offense, does not disqualify someone from holding public office or obtaining various licenses, and the YO record is not supposed to be made available to third parties. *See id*. § 720.35.

Thus, while the PSR correctly calculates that Mr. Oliver has 4 criminal history points under *Jones*, 2 of those 4 points are based on a YO adjudication that New York State does not intend to be counted toward adult criminal history. A score of 2 would have put Mr. Oliver in Criminal History Category II instead of Criminal History Category III. Accordingly, a downward variance is warranted to offset the PSR's overstatement of his criminal history.

## 2.  Additional PSR objection

We have previously submitted to Probation certain minor clarifications to the PSR. We have identified one additional correction that must be made to paragraph 37, and have made Probation and the government aware of the requested change. Paragraph 37 states that in 2005 Mr. Oliver was convicted of criminal possession of a weapon in the 4th degree, and that the gun he possessed was loaded. However, that is not correct – the gun was not loaded. This is substantiated by the 2005 Firearm Examination Report, which has been provided to Probation and the government and which reflects that while a gun was received into evidence, no ammunition was received into evidence. Additionally, Mr. Oliver was charged with misdemeanor criminal possession of a weapon in the 4th degree for this offense, a charge that would not have applied if the gun had been loaded. While this correction does not impact Mr. Oliver's criminal history level or his Guidelines, it is critical to the Court's understanding of his prior conduct and the PSR's accuracy.

## B.  Mr. Oliver's youth at the time of the offense

Mr. Oliver was just 20 years old at the time of the offense. As Dr. Drob explains in his

Hon. Alvin K. Hellerstein
Page 7

report, youth is an incredibly important factor in evaluating an individual defendant's culpability:

> Mr. Oliver's severe criminal conduct occurred during a period in which brain immaturity renders individuals particularly subject to negative influences from the environment, and high risk, impulsive behaviors. The criminal conduct for which Mr. Oliver has pled guilty took place from late adolescence to age 20. While Mr. Oliver continued to have some difficulties with the law into his mid-20s, his offense conduct can best be understood in the context of both his highly traumatizing childhood and the immature level of brain maturity of adolescents and young adults. Research indicates that the brains of individuals in their teens and early 20s are not fully developed. There is a very substantial and increasing body of evidence that they are thus less capable of controlling their impulses, exercising self-regulation, assessing and avoiding risk, and rationally considering alternative courses of action than older adults. They are also less attentive to the consequences of their actions than adults and are more susceptible to negative influences by peers. It should be noted that the psychological and brain immaturity of adolescents do not correct themselves overnight but extend well into a person's 20s. While by the age 16 or 17 adolescents show progression in cognitive development that closely approximates that of (26 to 30-year-old) adults, this is not the case for psychosocial maturity. Indeed, one major study indicates that the proportion of individuals age 18 - 21 who have reached levels of psychosocial maturity comparable to (26 to 30-year-old) adults is no higher than the proportion of adolescents and even pre-adolescents who have reached these levels.

Ex. B at 14 (citing Steinberg, L. et. al. Are Adolescents Less Mature than Adults? American Psychologist, Oct. 2009, Vol. 64, No. 7, pp. 583-94).

The Supreme Court has recognized the unique features of the developing adolescent brain and its impact on the criminal justice system, first in *Roper v. Simmons*, 543 U.S. 551, 570 (2005), when it barred the death penalty for juveniles, and later in *Miller v. Alabama*, 567 U.S. 460, 477 (2012), when it prohibited the imposition of a mandatory life sentence without parole for juveniles. In *Miller*, the Court explained the scientific consensus:

> Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." [*Graham v. Florida*, 560 U.S. 48, 68, (2010)]. Those cases relied on three significant gaps between juveniles and adults. First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569 []. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and

Hon. Alvin K. Hellerstein
Page 8

> lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id*., at 570 [].

*Miller*, 567 U.S. at 471. The science has developed further since that decision, recognizing that this distinction continues into an individual's early twenties, with the brain not fully developed until age 25.

The fact that youth – including the early twenties – is an important factor that warrants a downward variance was recently recognized by the United States Sentencing Commission when it published the Amendments to the 2024 Guidelines, which are scheduled to go into effect on November 1, 2024.[8] The Amendments include a new policy statement relating to age in § 5H1.1 that provides stronger language permitting a downward departure or alternative to incarceration on the basis of "youthfulness." As explained by the Sentencing Commission, the proposed Amendment would change § 5H1.1 so that the first sentence would provide solely that "[a]ge may be relevant in determining whether a departure is warranted." The proposed policy statement explains the reasoning behind the change:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age.

*Id*. at 15. Mr. Oliver's very young age at the time of the offense warrants a downward variance here.

## C.  Mr. Oliver's personal history and characteristics

The mitigation report details the profound adversity that Mr. Oliver faced from the time he was a baby through his adolescence and young adulthood. He was both a victim of and

---

[8] *Available at*: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202404_prelim-rf.pdf.

Hon. Alvin K. Hellerstein
Page 9

witness to abuse and violence from a very young age, and this had a significant effect on his development and his ability to navigate the world. As Dr. Drob explained in his report, the sheer number of adverse childhood experiences that Mr. Oliver endured both triggered PTSD and increased his risk for various negative outcomes, including involvement with the criminal justice system. Ex. B at 13.

But that does not mean that Mr. Oliver could not overcome the adversity of his youth and mature into a responsible adult – and this is indeed what he has spent the second half of his life doing. Dr. Drob goes on to observe that "there are strong indications that Mr. Oliver is indeed a changed person, whose level of social maturity, concern for others, psychological stability, impulse control, decision-making, and ethics, have all been transformed in a highly positive manner since he engaged in the conduct for which he will now be sentenced." *Id*. at 14.

This transformation is made clear by the outpouring of support from Mr. Oliver's family and friends. He is a kind, dedicated, and loving father and partner. It was his life's goal to get as far away from the Bronx as he could, and to give his children a better life. He has succeeded. Two of his children are in college and a third will be starting this fall – and he was able to provide all of them with the support and stability that he never had growing up.

His fiancée, Kimberly Mitchell, writes of the love and support Mr. Oliver has always shown to her and her children:

> He is the most caring, genuine, and sincere person I have ever met. He has been a great stepfather to my two children . . . . When my son turned 16, we had a surprise birthday party for him, and if it wasn't for Terris I wouldn't have been able to pull it off. He helped clean the house to get ready for it, helped decorate and even cooked all the food for the party. I've had covid two times, and other sicknesses and during those times, he was there to help around the house, cleaning, doing laundry, grocery shopping and cooking. My daughter wasn't eligible to take the bus, and he was there to help bring her to school every day, and pick her up while I had to work early hours.

Ex. C at 2.

His eldest son, Terrence, writes of the incredible love he has always felt from his father:

> Growing up, my Father was my hero. He was the one who taught me how to ride a bike, who cheered me on at every basketball game, helped me with my homework and who I saw go to work everyday to make sure we have what we needed. Despite being the sole provider in the household of six, he has always been there for me,

Hon. Alvin K. Hellerstein
Page 10

> offering love, support, and guidance when I needed it most.
>
> My Father's commitment to family has always been first, he goes above and beyond to care for and support me and my siblings, demonstrating as an example of responsibility and commitment - I have always known that I am a priority.

Ex. C at 4.

Mr. Oliver's son, Javier, describes how much his father means to him and how present he is in his life:

> [H]e has been a pillar of strength and guidance in my life, shaping me into the person I am today. His unwavering support and wisdom have left an indelible mark on my heart, instilling values of integrity, compassion, and perseverance. I hold my father figure in the highest regard, cherishing every moment spent in his presence and treasuring the lessons he has imparted upon me. His unconditional love has provided me with a sense of security and belonging, empowering me to navigate life's challenges with confidence and grace. . . . I am immensely grateful for the positive influence my father has had on my life. Despite the challenges we've faced and the distance between us, his commitment to me and my siblings has been unwavering.

Ex. C at 6-7.

Although Mr. Oliver and Ms. Torres are no longer together, they are still dedicated co-parents. She writes of his love for his family and his identity as a father who "was there for every significant moment, from birthdays to graduations, and his support was a pillar in our day-to-day lives." Ex. C at 9. She explains:

> Terris is a hardworking man. He has always been a devoted provider. Terris has contributed to his greatest extent and absolute best ability for almost two decades. Despite any obstacles, he has never strayed from his responsibilities towards our children. I have witnessed firsthand his dedication and love for them.
>
> Moreover, Terris has shown intense consideration and understanding towards each of our children's complex needs and differences. He has always gone above and beyond to ensure they feel loved, supported, and understood. His commitment to their well-being is unwavering. Terris has unique relationships with each of our children [] as they are in different stages in life, and it is crucial to continue this relationship in their adolescent lives. He has always been an active father since their

Hon. Alvin K. Hellerstein
Page 11

birth and continues to honor this.

It is important to note that Terris has made significant strides in his personal growth. Over the past two decades, he has distanced himself from the negative influences of his youth, choosing instead to focus on building a better life for himself and our family. I have had the privilege of witnessing his transformation into a responsible and compassionate individual, which I believe is a testament to his potential for rehabilitation.

*Id*. at 8. Mr. Oliver's other former partners write similarly glowing accounts, and attest to the devotion he shows to each of his children.

Mr. Oliver's mother also speaks of his dedication to his family: "For over two and a half decades, Terris has worked hard to care for his family as the sole provider in a household of six (6). Working back-breaking jobs without his High School diploma but determined to keep food on the table and a roof over their heads . . ." Ex. C at 13. Although Mr. Oliver's relationship with his mother has been strained, she remains in his life and they are working toward healing the wounds of the past.

These themes are repeated over and over in the many letters submitted by Mr. Oliver's family and friends, all of whom attest to his fundamental goodness, his dedication to change, and his hope for a better future despite his past decisions.

As part of his commitment to changing his life, Mr. Oliver dedicated himself to finding work so that he could support his family. He started as a cashier and worked his way up from there, including working as a gas station attendant and a cable technician. He eventually got his OSHA certification and spent the last several years as a driver for trucking and delivery companies.

After his arrest and detention at MDC, Mr. Oliver has done everything he can to make productive use of his time. He has completed numerous courses and taken his GED exam. *See* Ex. D. He worked as an orderly, where he received outstanding reviews. *See* Ex. E. And he has no disciplinary infractions.

Mr. Oliver is a different person now than he was 20 years ago. He is a middle-aged father and grandfather who has not had significant contact with the criminal justice system since his early twenties. Although he decided to change his life – and succeeded – that does not mean he isn't haunted by the crime he committed when he was young. He takes full responsibility for what he did. As he writes in his letter to the Court:

Hon. Alvin K. Hellerstein
Page 12

> I would like to apologize to the family of Mr. Felton. I know their life has been difficult without him here. I wish so much that the day this happened I just went somewhere far away. My mind frame at the time was to protect my life. I have seen a lot of death since childhood. In the process I destroyed Mr. Felton's life and his family's lives, and also my kids' life. I know my actions are inexcusable!!! I tried to change my life around for the sake of me and my kids by moving to Boston to make sure my kids had more positive influences. My goal was to give them a better chance to succeed in life. With my actions I have to explain to them why I put myself in this position. I will use my time to better myself with education and programs while incarcerated. My ultimate goal is to get certification to counsel kids and fellow inmates to better themselves. I will follow all recommendations set forth by the court in my sentence and following my release. I will do everything in my power to become a better man, father, husband and productive member of the community.

Ex. C at 1. It is our hope that the Court will consider Mr. Oliver's genuine remorse and rehabilitation in formulating a sentence that is sufficient, but not greater than necessary, in his case.

### D.  Avoiding sentencing disparities

Mr. Oliver's co-defendant, Ricardo Ayala, was sentenced on May 6, 2024 to 220 months for this offense. Not only does Mr. Oliver have significant mitigation factors and demonstrated rehabilitation over the last two decades, courts in this district frequently sentence defendants to less than 240 months for similar conduct, including in the absence of such strong mitigation. For example, in the related 2017 case involving the same drug organization, Judge Pauley sentenced defendant James Diaz to 216 months incarceration. This was despite the fact that Mr. Diaz was a shooter in a drug-related murder and was also involved in an additional shooting. *See United States v. James Diaz*, 17 Cr. 21, ECF No. 499 (Pauley, J.). This Court and others have reached the same conclusion in similar cases and even in those with more egregious conduct. *See, e.g., United States v. Jose Rodriguez*, 19 Cr. 779, ECF No. 75 (Hellerstein, J.) (sentence of 225 months for defendant with 13 criminal history points who was recruited by the organization's leader to be a shooter during retaliatory gang murder); *United States v. Humberto Rodriguez*, 21 Cr. 301, ECF No. 293 (Castel, J.) (sentence of 222 months for defendant who was shooter in retaliatory murder for drug deal robbery).

A downward variance would avoid unwanted disparities with Mr. Oliver's co-defendant, defendants in the 2017 indictment, and other similarly situated defendants.

### E.  The conditions of confinement during Mr. Oliver's pretrial detention at MDC should be considered in the Court's sentencing determination

Hon. Alvin K. Hellerstein
Page 13

Finally, the conditions of confinement at MDC during the time Mr. Oliver has been incarcerated there have been unusually grueling. As Judge Furman detailed in his decision in *United States v. Chavez*:

> [T]he dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband — from drugs to cell phones — is widespread. At least four inmates have died by suicide in the past three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

2024 WL 50233, at *1 (Jan. 4, 2023) (citations omitted). And Mr. Oliver has indeed experienced those conditions – since June 2023 the facility has imposed constant lockdowns, with inmates allowed out of their cells very briefly each day, or not at all. On weekends defendants are routinely locked in their cells continuously from Friday evening to Monday morning. And there have been multiple emergency lockdowns in just the past few months where defendants have been confined to their cells for days on end, often due to reports of violence. In fact, in the nearly eleven months that Mr. Oliver has been detained at MDC, his unit has been on complete lockdown for over 42% of the time, including a continuous 19-day lockdown for the entire winter holiday, from December 14th through January 1st. And most recently, news outlets have reported that inmates have routinely been served spoiled or insect-infested food, among other horrific conditions.[9]

Courts in this district have recognized that the harsh conditions of confinement during the COVID-19 pandemic and afterward should be factored into sentencing decisions. *See, e.g.*, *United States v. Anthony Smith*, 21 Cr. 414, ECF No. 349, Sent. Tr. at 56:8-12 (S.D.N.Y. Jan 25, 2024) (Failla, J.) (considering harsh conditions of confinement at MDC in downward variance); *United States v. Carillo-Berber*, 18 Cr. 703, ECF No. 28, Sent. Tr. at 24:9-25:2 (S.D.N.Y. July 29, 2020) (Crotty, J.) (same). The many months that Mr. Oliver has been incarcerated at MDC have been more difficult than they otherwise would have been, and we respectfully submit that the Court should factor those conditions into its sentencing determination.

---

[9] N.Y. Daily News, Maggot-infested meals being served to inmates at Brooklyn federal Jail lawyers say (Mar. 30, 2024), *available at*: https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-at-brooklyn-federal-jail-lawyers-say/.

Hon. Alvin K. Hellerstein
Page 14

## IV.  Conclusion

For the foregoing reasons, and most importantly Mr. Oliver's youth at the time of the offense, severe mitigating circumstances, and significant rehabilitation, I respectfully submit that a downward variance would be sufficient but not greater than necessary to accomplish the goals of sentencing in this case.[10]

Thank you for your consideration.

Respectfully submitted,

/s/

Megan Wall-Wolff
Wall-Wolff LLC
299 Broadway, Suite 800
New York, NY 10007
(212) 920-0257

*Attorney for Terris Oliver*

---

[10] We respectfully request that the Court recommend that BOP designate Mr. Oliver to a facility as close to Bridgewater, Massachusetts, as possible so that he can be near his children and to facilitate family visitation.