

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 29, 2024

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

  **Re:**  ***United States v. Terris Oliver*, 22 Cr. 378 (AKH)**

Dear Judge Hellerstein:

   The defendant in the above-captioned case is scheduled to be sentenced on June 4, 2024 at 10:00 a.m.  For the reasons set forth below, the Government respectfully submits that the stipulated sentence of 240 months' imprisonment, as called for by the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), is necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

### I. Offense Conduct

   On March 27, 2002, defendant Terris Oliver knowingly participated in a drug crew's premeditated ambush of Atari Felton.  That night, Oliver and at least three other men fired approximately 25 shots in the direction of an open bodega on the corner of crowded city streets, surrounded by apartment buildings and countless innocent people in the line of fire.  (An additional shooter's gun jammed, resulting in an undischarged bullet being expelled from one of the guns.)  One of the many fired bullets struck Felton in the lower back, causing lethal injuries from which he died within a few hours at the hospital.  At the time of his death, Atari Felton (pictured below) was just 19 years old.

*[Photographs on next page]*

 

The defendant and other area drug dealers targeted Felton because Felton threatened the rampant open-air drug dealing at the corner of Monroe Avenue and East 175th Street. Dealers on that block—known as "240" because of their proximity of 240 East 175th Street—sold crack cocaine, heroin, and other drugs for years prior to Felton's murder, and for more than a decade after. The defendant engaged in that business, distributing primarily crack cocaine. Some members of 240 worked directly for one of the group's suppliers, selling product on commission or for a percentage of the sales, while others sold their own product with the blessing and permission of the most established dealers. Together, the group would ensure that outsiders could not encroach on 240's territory. In the three years prior to the murder of Atari Felton, the defendant incurred six arrests for, among other things, criminal possession of a machinegun (on September 9, 2000), criminal possession of a controlled substance with intent to sell (on October 14, 2000), and assault (on February 23, 2001). The first of these arrests—for criminal possession of a machinegun—resulted in a youthful offender adjudication for attempted criminal possession of a loaded firearm, for which the defendant was sentenced in November 2000 to five years' probation. PSR ¶ 36. The arrest occurred after the defendant caused risk of personal injury and death to other people by firing a loaded .22-caliber revolver at approximately 1:45 a.m. *Id.*

In early 2002, Atari Felton sold narcotics a few blocks away from the 240 crew. When plans to merge 240 with Felton's drug operation fell through, violence between the groups began. During the day of March 27, 2002, Felton and his cousin ran through 240 and fired shots, targeting 240's dealers. As the day went on, members of 240—including the defendant— gathered in the center of their territory, near Monroe and 175th, where they distributed guns amongst themselves and discussed the need to retaliate against Felton by finding and shooting him that same night. Departing from 240, most of the participants got into two vehicles and drove towards Clay Avenue and East 173rd Street; other participants walked. All of them,

including the defendant, knew the plan.  When members of 240 saw Felton exiting a corner store, at least five shooters, including the defendant, opened fire, discharging round after round at Felton.  The group then fled and met up later to collect the guns and discuss what happened.

In the years that followed Felton's murder, the defendant continued to run afoul of the law.  In September 2005, inside of the 240 apartment building, the defendant pointed a handgun at another man and explicitly threatened to kill that man, all in the presence of the defendant's own five-year-old child.  *Id.* ¶ 37.  Upon arrest, the defendant was found to have an unloaded .40-caliber Smith & Wesson pistol in the waistband of his pants.  *Id.*  Four years later, in June 2009, the defendant was arrested in Worcester, Massachusetts for resisting arrest and disorderly conduct, *id.* ¶ 42; then the following month, in July 2009, the defendant was arrested again at 240 East 175th Street after he grabbed and assaulted a police officer, punching and knocking the officer to the ground.

## II.  The Defendant's Plea and Applicable Guidelines Range

On July 12, 2022, a grand jury returned Indictment 22 Cr. 378 (AKH), which charged the defendant with murder while engaged in a narcotics conspiracy and murder through use of a firearm, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. §§ 924(j) and 2.  The defendant was arrested on or about July 19, 2022.  These charges carried a mandatory minimum sentence of 20 years' imprisonment and a statutory maximum of life.

On December 13, 2023, the defendant pled guilty, pursuant to a plea agreement, to a Superseding Information, which charged him with conspiring to distribute heroin, crack cocaine, and marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).[1]  Under his agreement, the defendant stipulated that his Guidelines offense level is 40, based on application of level 43 under the first-degree murder section, and a three-level reduction for acceptance of responsibility.  U.S.S.G. §§ 2D1.1(d)(1), 2A1.1(a), and 3E1.1.  Because the defendant was also sentenced in 2006 to 60 days' imprisonment for criminal possession of a weapon, *id.* ¶ 37, the parties stipulated that he has two criminal history points, resulting in a Criminal History Category of II.  *Id.* ¶ 6(h).  Accordingly, the plea agreement stipulates that the defendant's Guidelines range *would have been* 324 to 405 months' imprisonment, but due to the statutory maximum of 20 years, his applicable Guidelines range is 240 months' imprisonment, per U.S.S.G. § 5G1.1(a).

Probation agrees with these calculations except that it attributes two criminal history points to the defendant for a 2000 youthful offender adjudication for attempted criminal possession of a loaded firearm, which increases his Criminal History Category to III.  *Id.* ¶¶ 36, 38-39.  With this change, the defendant's Guidelines range *would have been* 360 months to life in prison absent a statutory maximum on his count of conviction; however, with that cap, his Guidelines sentence remains 240 months' imprisonment, per U.S.S.G. § 5G1.1(a).  *Id.* ¶ 79.

---

[1] The PSR mistakenly states that the plea was on December 14, *see* PSR ¶¶ 1, 4, 8, which is the date that co-defendant Ayala pled guilty.

### III.   Discussion

#### A.  Applicable Law

Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. 220, 264 (2005).  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B.    A Sentence of 240 Months' Imprisonment is Necessary in this Case.

1.    <u>A 240-Month Sentence Should Be Imposed.</u>

The Government respectfully submits that the stipulated Guidelines sentence of 240 months' imprisonment is necessary in this case to reflect the seriousness of the defendant's conduct, promote respect for the law, provide just punishment for the offense, and accomplish general deterrence to those who, like the defendant, participate in premeditated murders.

Any sentence below 240 months' imprisonment would fail to reflect the seriousness of the defendant's conduct or promote respect for the law.  There is no crime more grave, more destructive, and more damaging to an individual, a family, and a community than murder.  The taking of a human life is irrevocable.  It cannot be healed, cured, repaid, or undone.  When life is

snuffed out, it is lost forever.  Atari Felton was 19 years old when the defendant and three other members of 240 unleashed a barrage of gunfire at Felton, firing more than 20 shots at an open storefront in a residential neighborhood.  This brazen ambush was planned and premeditated, with the defendant and others from 240 specifically seeking out Felton for the purpose of ridding themselves of an antagonist to their drug business.  And they succeeded in ending Felton's life that night.  Atari Felton's family has lived without him for more than two decades.  He has now been dead longer than he was alive (22 versus 19 years).[2]  In that time, nearly all of Felton's killers have continued to walk the streets, socialize together, post about 240 on social media, sell drugs, and go in and out of jail.  Some have gotten jobs and started families; some have stayed on Monroe Avenue and sold drugs; some have done both.  Regardless of their different paths, nearly all of Felton's killers have had the opportunity to live lives with ups and downs that were taken, by force, from Atari Felton and Felton's family.[3]  Members of 240, including the defendant, participated in a murder—the single most heinous and irreversible crime a person can commit.  So even if this was the last crime the defendant ever committed—and it was not—a sentence of 240 months' imprisonment would be necessary to account for the seriousness of murder and the defendant's role in it.

A Guidelines sentence is also necessary to deter the defendant and others who are similarly situated from committing crime in the future.  Participating in the plan to shoot Atari Felton was not an aberration in an otherwise law-abiding life.  Members of 240 killed Felton to protect a long-running narcotics operation that started years before the murder and continued years after.  The defendant was even involved in another violent incident involving a gun during which, in the presence of his own small child, he pointed a gun at another man and threatened to kill the man.  PSR ¶ 37.  This occurred three and a half years after the murder of Atari Felton, demonstrating that his experience taking another young man's life had not deterred the defendant from threatening to shoot another person while brandishing a large-caliber gun.

Finally, the Government respectfully submits that any sentence below 240 months' imprisonment would fail to provide just punishment or deter others who might be tempted to participate in shootings.  There is no question that this murder occurred over 20 years ago, and the defendant may have moved on.  But Felton's family and friends could never move on.  His mother no doubt felt the pain of his absence over the years.  His cousins.  His community.  Given the pain and suffering that the defendant and his co-conspirators caused by participating in this murder, the Government respectfully submits that a significant downward variance would devalue Felton's life and the gravity of his killing.  Put simply, the defendant should not benefit from the fact that he was able to "get away with murder" for over 20 years.  General deterrence demands that criminals know that if they commit murder, they will have to look over their shoulder for the rest of their lives, knowing that no matter how much time passes, when they are caught, they will face significant punishment.  This is why, as Judge Rakoff said in another

---

[2] Some of Felton's family members continue to live in and around the same neighborhood as Felton's killers and in fact, some of them are even related to one another, as one of the shooters was Felton's cousin.  This makes it difficult, if not impossible, for grieving family members to provide victim-impact statements.

[3] Isaac Murray, a/k/a "Ike," was murdered in 2004.

context, "there is typically no statute of limitations for first-degree murder—for the obvious reason that it would be intolerable to let a cold-blooded murderer escape justice through the mere passage of time." *United States v. Quinones*, 96 F. Supp. 2d 416, 418 (S.D.N.Y. 2002).  Respect for Atari Felton's basic human dignity demands a very serious sentence.[4]

For all of these reasons, the Government respectfully submits that the Court should impose a sentence that is in line with sentences that the Court has imposed in other first-degree murder cases.  *See United States v. Jose Rodriguez and Kyle Mullings*, 19 Cr. 779 (AKH) (225 months' imprisonment and 240 months' imprisonment); *United States v. Robert Wilson et al.*, 19 Cr. 625 (JMF) (sentences between 252 months' imprisonment and 444 months' imprisonment). Just weeks ago, on May 6, 2024, the Court imposed a sentence of 220 months' imprisonment on co-defendant Ricardo Ayala, whom the Court and Government accepted, *arguendo*, was a lookout during the murder.  A significant downward variance for this defendant would create an unjustified disparity, not only between him and similar defendants throughout the District, but also between him and his own co-defendant. A 240-month sentence is thus sufficient, but not greater than necessary, to accomplish the goals of sentencing in this case.

## 2.    The Defendant's Arguments for Leniency Are Unconvincing.

The defendant's request for leniency is based almost entirely on the representation that he turned his life around after leaving the Bronx.  It is not extraordinary, however, that the defendant went on to father children and work lawful jobs.  In fact, living a life free of gun violence (which he did not start doing until at least 2005) should be expected of all grown men in civilized society.  *See United States v. Mumuni*, 946 F.3d 97, 112 (2d Cir. 2019) (finding that "no substantially mitigating weight can be borne here by the fact that [the defendant] did what was plainly required of him—that is, behaving himself [while in custody].");  *cf. Whittingham v. United States*, No. 12 Cr. 971 (RJS), 2017 WL 2257347, at *6 (S.D.N.Y. May 22, 2017) (Sullivan, J.) (explaining that "full compliance" with supervised release is "exactly what is expected of all defendants" and therefore is not "special" or "extraordinary" circumstance warranting early termination of supervised release).  The defendant's post-murder life is not "extraordinary" or "unusual" enough to justify a significant variance.  *See United States v. Carpenter*, 320 F.3d 334, 344 (2d Cir. 2003) (reversing sentencing court's downward departure for post-offense conduct that was "commendable *but not "extraordinary"* (emphasis added). Indeed, a downward variance merely because the defendant got a job and started a family would result in a sentence that fails to adequately balance the other factors in § 3553(a).  *See United States v. Ceasar*, 10 F.4th 66, 80 (2d Cir. 2021) (district court abused its discretion by considering the need for rehabilitation "nearly to the exclusion of countervailing sentencing factors").

It is also perverse that the defendant asks for leniency based on his own maturity in the 22 years since Felton's murder.  Like the defendant and other 240 members, Felton was deeply

---

[4] The Probation Office agrees.  In its PSR, Probation recommends a sentence of 200 months' imprisonment for some of the same reasons that the Government seeks a sentence of 240 months—most importantly, to reflect the seriousness of the offense conduct.  *See* PSR at 23-24.

involved in gang and drug activity at the time of his murder, but Felton was brutally stripped of the chance to grow, mature, parent children, or otherwise redeem himself in the years that followed.  The defendant should not now get a break at sentencing because he has had the opportunity to live decades longer than the young man he helped kill.

*Finally*, to the extent that the Court finds any of the defendant's arguments for a downward variance compelling, the 20-year stipulated Guidelines sentence more than adequately accounts for any mitigating circumstances in this case.  The defendant was originally charged with an offense that carried a statutory maximum of life and a Guidelines range of 360 months' to life imprisonment.   If that were the applicable Guidelines range here, the defendant's requests for a below-Guidelines sentence might have some arguable force.  But given that the defendant has already received a significant decrease in the applicable Guidelines range by virtue of the statutory maximum, no further variance would be needed under § 3553(a).  To the contrary, any further downward variance would result in a sentence that fails to accomplish the statutory goals of sentencing.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose the Guidelines sentence of 240 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  _____
Frank J. Balsamello / Andrew K. Chan /
  Matthew Andrews
Assistant United States Attorneys
(212) 637-2325 / -1072 / -6526

cc: Megan Wall-Wolff, Esq., *counsel for defendant Terris Oliver*